MASSACHUSETTS COALITION FOR THE HOMELESS & others[1] *vs.*
SECRETARY OF HUMAN SERVICES & another.[2]

Suffolk. May 7, 1987. — August 18, 1987.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Aid to Families with Dependent Children. Public Welfare. Constitutional
Law*, Appropriation of money, Separation of powers, General law. *Sta-
tute*, Appropriation of money, General law.

Description of the Massachusetts program of Aid to Families with Dependent
Children (AFDC) and its provision for the determination of standards
of need and standards of payment for AFDC beneficiaries. [812-814]

General Laws c. 29, § 7L, did not bar the Legislature's use of the annual
State budget to establish the standard of need for purposes of adminis-
tering the Massachusetts program of Aid to Families with Dependent
Children, in preference to allowing this standard to be established by
the Department of Public Welfare consistent with the department's re-
sponsibility under G. L. c. 18, § 2 (B) (*g*). [814-818]

The Department of Public Welfare is required by the provisions of G. L.
c. 18, § 2 (B) (*g*), to perform an annual review in order to assess the
adequacy of grant levels provided in the Massachusetts program for Aid
to Families with Dependent Children under the standard of G. L. c. 118,
§ 2, in relation to the standard of need for such families fixed by the
Legislature. [818]

If, in any year, the Department of Public Welfare concludes that the level
of payment for Aid to Families with Dependent Children (AFDC) is
insufficient to permit the department to furnish the level of payment it
has determined to be necessary under the standard of G. L. c. 118, § 2,
to permit AFDC parents to bring up their children properly in their own
homes, the department's obligation, in order to discharge its statutory
duties, is to request the Legislature to either appropriate an adequate
sum or provide some other solution. [818-820]

---

[1] Massachusetts Coalition for Basic Human Needs, Celeste Freeman,
Kathy Goodwin, and Candy Heyser. Other women have been permitted to
intervene as plaintiffs from time to time.

[2] The Commissioner of Public Welfare. The Governor was named as a
defendant. The action was dismissed as to him, and the plaintiffs have not
challenged that ruling.

The Department of Public Welfare does not fulfil its duty under G. L.
   c. 118, § 2, to parents receiving Aid to Families with Dependent Children
   by furnishing housing accommodations in hotels, motels, and emergency
   shelters rather than by providing aid sufficient for such parents to live
   in a home. [820-821]
In the absence of a class certification, where the individual plaintiffs and
   interveners in an action seeking injunctive and declaratory relief no
   longer needed a court order concerning the duty of the Department of
   Public Welfare not to require the use of transient housing by recipients
   of Aid to Families with Dependent Children, this court remanded the
   action for a hearing on the matter of class certification and further
   consideration of appropriate orders on the issue. [822-824]

CIVIL ACTION commenced in the Superior Court Department
on December 10, 1985.

After proceedings before *Charles M. Grabau*, J., the case
was transferred to the Supreme Judicial Court for the county
of Suffolk and was reported by *O'Connor*, J.

*H. Reed Witherby*, Assistant Attorney General, for Secretary
of Human Services & another.

*Barbara Sard* (*Lucy A. Williams, Marjorie Heins, Karen
Slaney, & Belle Soloway* with her) for the plaintiffs.

*Scott P. Lewis & Rebecca P. McIntyre*, for The Massachu-
setts Council of Churches & others, amici curiae, submitted
a brief.

*Gene K. Landy*, for Massachusetts Committee for Children
and Youth, amicus curiae, submitted a brief.

WILKINS, J. In December, 1985, the plaintiffs filed a com-
plaint seeking declaratory and injunctive relief as to the failure
of the Massachusetts program of Aid to Families with Depend-
ent Children (AFDC) to pay benefits sufficient to enable parents
to raise their children in their own homes.

The plaintiffs sought a declaration that then current AFDC
payments did not reflect the level of needed AFDC assistance
which, they contend, the Commissioner of Public Welfare
(commissioner) must determine annually pursuant to G. L.
c. 118, § 2 (1984 ed.), and G. L. c. 18, § 2 (B) (*g*) (1984
ed.). They also sought an injunction directing the defendants
to increase the AFDC standards of assistance for AFDC ben-

eficiaries to reflect the requirements of G. L. c. 118, § 2, and G. L. c. 18, § 2 (B) (*g*), and then to take steps to be able to make AFDC payments equal to the appropriate standards of assistance. At the heart of the plaintiffs' grievance is the argument that many families receiving AFDC assistance are or may become homeless because AFDC grants are insufficient to permit them to afford adequate housing.[3]

After considerable discovery, the plaintiffs moved in May, 1986, for a preliminary injunction (1) ordering that the commissioner formulate "an AFDC standard budget of assistance, pursuant to G. L. c. 18, § 2 (B) (*g*), consistent with the com-

---

[3] We summarize facts shown in the record derived from statements of the Department of Public Welfare (department) or statements with which the department agrees.

Homelessness among families in Massachusetts appears to be increasing. Family homelessness is relatively recent as a major phenomenon. In 1985, 75% of the homeless were in families. Eighty per cent of homeless families rely on AFDC as their sole source of support. The department has estimated that in fiscal year 1987, 3,000 homeless families will seek its assistance.

The department recognizes that families on AFDC face much higher expenses than the amounts provided by their AFDC grants. While in 1970 the value of the maximum cash and food benefits that an AFDC family of four received was 120% of the Federal poverty line, in 1986 the benefits were 18% below the poverty line. The department recognizes that, as a result of inadequate grant levels, most AFDC families lack "adequate income to compete successfully for housing in the tight, private housing market," and those who lose their homes "face a nearly impossible task in finding a new place to live." Many AFDC recipients are forced to spend a disproportionate amount of their grants on housing (an average of 70% by the department's estimate), and they often fall behind on their rent and fuel bills and may become homeless.

The department has described the serious consequences that result from the underfunding of the basic AFDC grant as follows: "For the nearly 90% of AFDC families . . . whose only source of income is the monthly grant, the dangers of living on an inadequate grant are acute, creating a dangerous climate of poverty and family instability in which a number of problems threaten the well-being of parents and children. These problems include: increased risks of homelessness and destitution . . .; malnutrition and other health problems, especially stunted growth among children, low birth weights, increased dangers of infant mortality and ill health, and dangers to pregnant women; and family stress, including the danger of child and spouse abuse and neglect." Fiscal year 1986 Special Report on Benefits, Department of Public Welfare.

400 Mass. 806                                                               809

Massachusetts Coalition for the Homeless *v.* Secretary of Human Services.

mand of G. L. c. 118, § 2, that AFDC benefits be sufficient
to enable parents to bring up their children properly in their
own homes" and (2) directing the defendants "to pay, or take
whatever steps are necessary to enable them to pay, AFDC
benefits sufficient to enable parents to bring up their children
properly in their own homes." On June 26, 1986, a Superior
Court judge entered certain rulings and interlocutory orders,
granting partial relief to the plaintiffs. He declined to enter
any order at that time concerning the payment of benefits or
the taking of steps to enable certain payments to be made. He
declared, however, that the current level of AFDC benefits
did not meet the mandate of G. L. c. 118, § 2 ("The aid
furnished shall be sufficient to enable such parent to bring up
such child or children properly in his or her own home"). He
further declared that the Department of Public Welfare (depart-
ment) had an annual duty pursuant to G. L. c. 18, § 2 (B) (*g*)
and G. L. c. 118, § 2, to review "the adequacy of the A.F.D.C.
standards of assistance in light of the costs, among other items,
of housing A.F.D.C. families in their own homes." He ordered
the commissioner to formulate "a revised standard of assist-
ance" which would comply with that statutory mandate.

On August 29, 1986, the commissioner served a notice of
compliance accompanied by a report entitled "Report on Stand-
ard Budgets of Assistance and Efforts in the Commonwealth
to Assist Families Receiving Aid to Families With Dependent
Children." The report asserted in a footnote that the Standard
Budgets of Assistance formulated pursuant to G. L. c. 18, § 2
(B) (*g*), were neither standards of AFDC payments nor stand-
ards of AFDC need under Federal or State law. The principal
issue before this court arises because the parties disagree on
this very point. The plaintiffs say that the commissioner's
determination of a standard budget or budgets pursuant to G. L.
c. 18, § 2 (B) (*g*), and G. L. c. 118, § 2, has major signifi-
cance in the operation of the AFDC program. The defendants
deny this. We shall return to this question.

On December 8, 1986, the plaintiffs sought further relief,
moving for an order that the defendants develop "a plan for
legislative appropriation requests sufficient at least to raise

AFDC grants to the level of the standard budgets of assistance" submitted by the commissioner in August, 1986, and that the defendants request the Governor to submit a request for a supplemental appropriation for fiscal year 1987. After a hearing, the judge entered further interlocutory orders on January 5, 1987. He directed that, if any of the individual plaintiffs and their families had been in hotels, motels, or emergency shelters for more than ninety days, the commissioner should provide them with non-transient housing and, if subsidized public housing or certain subsidies were not available, the commissioner should spend AFDC funds to obtain housing in the private rental market. Effective thirty days from his order, (1) the department was enjoined from placing AFDC families in hotels, motels and emergency shelters for more than a total of ninety days and (2) the commissioner was ordered to expend funds to provide sufficient assistance for those families to obtain public housing or other nontransient housing. The judge also ordered the commissioner "to raise the level of AFDC benefits according to its [*sic*] revised budgetary standards."

The defendants immediately sought relief from the judge's order of the previous day, by filing a petition in the Supreme Judicial Court for the county of Suffolk (single justice session). The petition, purportedly under G. L. c. 231, § 118, first par. (1984 ed.), sought relief from the judge's order, which the defendants construed as directing "them to pay [AFDC] benefits at levels substantially in excess of the levels specifically established by the Legislature." The defendants also sought the transfer of the Superior Court action to the single justice session (G. L. c. 211, § 4A [1984 ed.]), and a reservation and report of the case to the full bench.

On the following day, January 7, 1987, the plaintiffs filed an opposition to the defendants' petition, stating that they had sought clarification of the judge's interim order of January 5. In their motion to clarify the interim order, the plaintiffs disclaimed any right to require an immediate increase in the level of AFDC payments, but rather they interpreted the judge's order to "raise the level of AFDC benefits" as one requiring the defendants to use all available means to secure the funds

necessary to pay benefits at the level of the revised budgetary standards. The Superior Court judge held a hearing on that same day to consider the request for clarification of his interim order of January 5.

On March 4, 1987, the judge issued an order of clarification. He appears to have ordered the department to raise the level of benefits (payments), by an amount it was to determine, to coincide with the revised standard budgets of assistance the commissioner described in his August, 1986, report, but he stayed the immediate effectiveness of this aspect of his order. He reaffirmed his conclusions about barring the use of transient housing for more than ninety days and vacated an earlier stay of his January 5, 1987, interim order in this respect.

The defendants promptly renewed their petition for relief before a single justice of this court. The parties stipulated to certain facts and agreed to the reservation and report of the Superior Court action to the full court by the single justice, if he should transfer it to the single justice session. The single justice transferred the Superior Court action, reserved and reported the case, and stayed the Superior Court judge's orders pending review. We treat the single justice's action as a report of the propriety of the various interim orders.

We have before us the lawfulness of the judge's interim orders. We shall consider them only to the extent that they are challenged by the defendants and defended by the plaintiffs.[4] We thus will not consider aspects of the judge's order that either the plaintiffs do not defend or the defendants do not challenge. The plaintiffs are not arguing here, for example, that the order properly could and does direct the immediate payment of AFDC benefits across the board at levels in excess of the level established by the Legislature in its 1987 fiscal year budget. The defendants' concern, expressed in their brief, that the judge's order violated separation of powers principles, expressed in art. 30 of the Declaration of Rights, by ordering the expenditure of funds without prior appropriation will be

[4] Neither party objects to consideration of the issues before us on a record developed before trial largely on affidavits.

met by vacating the order and directing the entry of declaratory and injunctive relief consistent with this opinion.

Similarly, the defendants do not object to the direction in the judge's June 26, 1986, order that the commissioner should annually review the department's standard (or standards) of assistance pursuant to G. L. c. 18, § 2 (B) (*g*). What the product of that annual review must be and what effect, if any, it may have on the operation of the AFDC program are issues which we must resolve in this proceeding.

We conclude that (1) the Legislature has established the AFDC standard of need in recent budgets and that the department acting under G. L. c. 18, § 2 (B) (*g*), has not; (2) the department nevertheless has an annual duty under G. L. c. 18, § 2 (B) (*g*), to review its budgets of assistance; (3) the department has an obligation to advise the Legislature whenever the department concludes the AFDC funds are not sufficient to permit it to provide the level of financial aid described in G. L. c. 118, § 2; (4) the department is directed by G. L. c. 118, § 2, to provide aid sufficient to permit AFDC recipients to live in homes of their own; and (5) there should be further proceedings concerning the declaratory or injunctive relief which may be appropriate as to homeless AFDC families.

Before explaining our reasons for these conclusions, we shall describe the AFDC program, its provision for the determination of standards of need and standards of payment for AFDC beneficiaries, and the Legislature's involvement, or at least attempted involvement, in the process of determining those standards in recent years.

AFDC is a joint Federal and State program to provide financial assistance to needy families with dependent children. See *Shea* v. *Vialpando*, 416 U.S. 251, 253 (1974); *Martinez* v. *Commissioner of Pub. Welfare*, 397 Mass. 386, 389 (1986). States have considerable discretion in setting standards of need and in setting the level of benefits to be paid to those who meet those standards. See *Shea* v. *Vialpando, supra; Rosado* v. *Wyman*, 397 U.S. 397, 408 (1970); *King* v. *Smith*, 392 U.S. 309, 318-319 (1968); *Civetti* v. *Commissioner of Pub. Welfare*, 392 Mass. 474, 476 n.4 (1984). If a State elects to participate in the program, however, it must comply with Fed-

eral requirements as a condition to obtaining reimbursement of a percentage of its AFDC payments (concurrently about 50%). See *Quern* v. *Mandley*, 436 U.S. 725, 728 (1978); *King* v. *Smith, supra* at 316; *Martinez* v. *Commissioner of Pub. Welfare, supra*.

The State must first establish "a yardstick for measuring who is eligible for public assistance" (*Rosado* v. *Wyman, supra*), which is called the "standard of need" (*King* v. *Smith, supra* at 318). The standard of need is "the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." *Shea* v. *Vialpando, supra*. See *Quern* v. *Mandley, supra* at 737. Next, the State may, if it wishes, establish a separate, lower "standard of payment," limiting the amount it will pay (*Rosado* v. *Wyman, supra* at 413; *King* v. *Smith, supra* at 318-319) as the maximum monthly grant for families of various sizes.

The department is charged with administering the AFDC program. G. L. c. 18, § 2 (1984 ed.). In Massachusetts the amount of an AFDC grant is the amount of the standard of need reduced by a family's countable income but never more than the maximum set by the standard of payment. 106 Code Mass. Regs. § 304.410 (1986). Until 1982, the standard of need and the standard of payment were the same in this State. See *ABCD, Inc*. v. *Commissioner of Pub. Welfare*, 378 Mass. 327, 332 (1979). In 1982 for the first time the Legislature provided in the annual budget that the standard of need would exceed the standard of payment. St. 1982, c. 191, line 4403-2000. This offered a work incentive because an AFDC family could earn countable income equal to the difference between its standard of payment and its standard of need without any reduction in its AFDC payments.[5]

---

[5] The determination of the standard of need does more than establish a theoretical level of income the State deems necessary for a family to subsist and below which it will be deemed needy. It is one determinant of eligibility for AFDC (and other) public assistance benefits. See 45 C.F.R. § 233.20 (a) (3) (xiii) (1986) (State plan must provide that no assistance unit will be eligible for AFDC benefits in any month in which its income exceeds 185% of the State's need standard); G. L. c. 118E, § 1 (1984 ed.) (medical assist-

The significant Massachusetts statutes are G. L. c. 18, § 2 (B) (*g*), and G. L. c. 118, § 2, first par. Section 2 (B) states the obligations of the department concerning the operation of public welfare financial assistance programs. Section 2 (B) (*g*) requires the department to "formulate a standard budget of assistance, the adequacy of which shall be reviewed annually." The department's standard budget of assistance, determined under § 2 (B) (*g*), once was viewed as fixing the standard of need for public assistance recipients. *Opinion of the Justices*, 368 Mass. 831, 836-837 (1975). For the purpose of establishing budgets of assistance, the first paragraph of G. L. c. 118, § 2, appearing in relevant part in the margin,[6] provides the standard. The department's aid to a parent must be sufficient to enable the parent to bring up his or her child or children "properly in his or her own home."

1. We reject the plaintiffs' argument that the standard of need for AFDC purposes is the standard set by the budgets of assistance, formulated by the department under G. L. c. 18, § 2 (B) (*g*), and complying with the standard expressed in G. L. c. 118, § 2. This argument says that by a general law the department has the authority to fix the AFDC standard of need.

The fatal weakness in the plaintiffs' argument is their claim that the department fixes the standard of need for AFDC purposes. Although it was once true, it has not been true in recent years. The Legislature has taken the task to itself in annual

ance benefits available to all persons eligible for financial assistance under G. L. c. 118). Under current regulations, setting the standard of need higher than the standard of payment would affect the total AFDC payments to be made in any year to families which have "countable" income. The standard of need, therefore, affects the pool of those categorically eligible for AFDC benefits and may affect the allocation of benefits between those families which have "countable" earnings and those which do not.

[6] "The department shall aid a parent in properly bringing up, in his or her own home, each dependent child, but no aid shall be granted, under this chapter, for, or on account of, any child unless the said child resides in the commonwealth. . . . The aid furnished shall be sufficient to enable such parent to bring up such child or children properly in his or her own home, and shall be in an amount to be determined in accordance with budgetary standards of the department, and shall be granted from the date of application therefor."

State budgets. For the fiscal year with which the Superior Court judge was concerned, the year which ended June 30, 1987, the Legislature appropriated AFDC funds "provided, that the standard [of payment] shall be increased [10%] as of [July 1, 1986] and rounded to the next whole dollar; provided further, that the need standard shall be raised to the new payment standard." St. 1986, c. 206, line 4403-2000. What the Legislature did for fiscal year 1987 fits into a pattern which it has followed in recent years, resulting in its determining the standard of need and leaving the department with a task to perform under G. L. c. 18, § 2 (B) (*g*), which is unrelated to the AFDC standard of need.[7]

We are not concerned here with good legislature practice or with the undesirability of a system that buries language in the budget which at least potentially conflicts with long-standing provisions of the General Laws. Here, the issue is whether there is any bar to the use of the budget to establish the AFDC standard of need.

---

[7] There is no doubt that in recent years the Legislature has been using the State budget to fix the standard of need. See St. 1979, c. 559, § 2, amending line 4403-2000, increasing "the standard of need." See also *ABCD, Inc.* v. *Commissioner of Pub. Welfare*, 378 Mass. 327, 338 (1979), citing budgets enacted in 1976 and 1977 which the department construed as increasing the standard of need by means of percentage increases in the basic grant.

For fiscal year 1983, the Legislature provided funds "[f]or a program of aid to families with dependent children; provided that the standard of need shall be increased by [5% as of July 1, 1982]; provided, further, that the payment level shall be ratably reduced to [95.24%] of said standard of need." St. 1982, c. 191, line 4403-2000. In subsequent years changes were made in the same way to the standard of need and to the payment standard. See St. 1983, c. 289, line 4403-2000; St. 1984, c. 234, line 4403-2000. For fiscal year 1986, the Legislature increased the payment standard but not the standard of need. St. 1985, c. 140, line 4403-2000.

The budget recently adopted for fiscal year 1988 provides "that the standard shall be increased [7% as of July 1, 1987] . . .; provided further, that the need standard shall be raised to the new payment standard." St. 1987, c. 199, line 4403-2000. The same provision states "that to recognize the special needs of recipients who must obtain private housing in the tight Massachusetts housing market, a forty dollar per month rent allowance shall be paid to all households not residing in public housing or subsidized housing, subject to federal reimbursement." There are additional provisions concerning such households if Federal reimbursement is not obtained. *Id.*

The plaintiffs rely on G. L. c. 29, § 7L (1984 ed.), which is quoted in full in the margin.[8] The plaintiffs read § 7L to forbid the determination of the AFDC standard of need in the State budget because that would be a provision on another (nonappropriation) "subject matter," in violation of § 7L. That section appears to be an impermissible attempt by one Legislature to dictate to subsequent ones the way in which constitutionally permissible legislative processes may work.[9] Section 7L does not have the force of a constitutional provision restricting particular provisions in a budget, such as exists in some States. See, e.g., *Brown* v. *Firestone*, 382 So. 2d 654, 663-664 (Fla. 1980) (constitutional provision that "[l]aws making appropriations for . . . current expenses of the state shall contain provisions on no other subject" (Fla. Const. art. III, § 12 [1986 Rev.]) prohibits appropriations bills from changing or amending existing law on subjects other than appropriations); *Benjamin* v. *Devon Bank*, 68 Ill. 2d 142, 149 (1977) (restrictions or qualifications in an appropriation bill which change substantive law violate constitutional provision that "[a]ppropriation bills shall be limited to the subject of appropriations" (Ill. Const. art. IV, § 8 [d] [1970]).

Even if § 7L is binding on Legislatures subsequent to the one that enacted it, the plaintiffs have read it too broadly. It applies only to any "appropriation for expenses of the commonwealth," a term that is defined as expenses of running the government, State debts, local aid, and other items of expense. That language does not include all appropriations, and it does

---

[8] "A law making an appropriation for expenses of the commonwealth shall not contain provisions on any other subject matter. As used in this section, expenses of the commonwealth shall include expenses of the executive, legislative, and judicial departments, interest, payments on the public debt, local aid, and other items of expense authorized or required by existing law."

[9] In *Lexington* v. *Commissioner of Educ.*, 393 Mass. 693 (1985), this court gave effect to St. 1980, c. 580 (Proposition 2½), to invalidate action taken by a subsequent Legislature. In that case the Commissioner of Education did not argue that the relevant aspect of St. 1980, c. 580, was an impermissible attempt to limit constitutionally permissible conduct of a subsequent Legislature.

400 Mass. 806                                                    817

Massachusetts Coalition for the Homeless *v.* Secretary of Human Services.

not clearly include obligations to pay AFDC benefits. Moreover, the fixing of the AFDC standard of need is not unambiguously a provision on a "subject matter" other than an appropriation. The AFDC standard of need has a direct bearing both on the amount of money that will be needed to pay AFDC benefits in any year and on the composition of the group who may receive AFDC benefits. It states limits on how appropriated funds may be used.[10]

We conclude, without resolving all uncertainties in the proper construction of § 7L, that § 7L did not forbid the Legislature from taking the action it did in fixing the AFDC standard of need for fiscal year 1987 (or for fiscal year 1988). Certainly various Legislatures in session since the enactment of § 7L in 1981 (St. 1981, c. 690) have not interpreted § 7L as barring budget provisions (either as part of line items or as "outside sections") bearing on a wide variety of matters unrelated to appropriations. The meaning of § 7L is certainly ambiguous. Just as in appropriate circumstances we have given deference to an administrative agency's interpretation of the meaning of a law to be administered by it (*Martinez* v. *Commissioner of Pub. Welfare*, 397 Mass. 386, 392 [1986]; *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 [1979]), we defer to the Legislature's implied but consistent interpretation of § 7L as not barring it from fixing the AFDC standard of need in the budget.[11]

---

[10] It is doubtful that the Governor could properly have used an item veto to eliminate the portion of the line item language which set the AFDC standards of need. See *Opinion of the Justices*, 384 Mass. 828, 837-838 (1981); *Attorney Gen.* v. *Administrative Justice of the Boston Mun. Court Dep't*, 384 Mass. 511, 515 (1981). The provisions concerning AFDC standards did "direct the way an appropriation is to be used or qualify the appropriation" (*id.*) and thus would not be "separable and susceptible to an item veto" (*id.*). The test under § 7L, if it applies at all, might fairly be the same one as that used to decide whether a budget provision is subject to an item veto.

[11] Because as a matter of State law, the department's determination of standard budgets of assistance under G. L. c. 18, § 2 (B) (*g*), in recent years has not been a determination of an AFDC standard of need, no Federal law requirements are significantly involved in this case. Federal AFDC law incorporates by reference requirements established by State law (*Everett* v.

A declaration should be entered that the Legislature has fixed the AFDC standard of need in the budget.

2. We conclude that, despite the Legislature's assumption of the determination of the AFDC standard of need, the department still has a duty to perform under G. L. c. 18, § 2 (B) (*g*). This duty includes formulating a standard budget of assistance which reflects the standard expressed in G. L. c. 118, § 2 (the cost to a parent of bringing up his or her children "in his or her own home"). The annual review required by § 2 (B) (*g*) will provide a yardstick against which to test the standards fixed by the Legislature.

In order to perform a meaningful annual review pursuant to § 2 (B) (*g*), the department should issue a written report which will provide or permit a comparison in dollars between the standard budgets of assistance of each successive year and which, as the department has done, will discuss the adequacy of AFDC grant levels in comparison with the standard budget or budgets of assistance and with changes in the consumer price index.

A declaration of the department's annual duties under § 2 (B) (*g*) should be entered.

3. What we have said so far does not resolve the dilemma which confronts the department in dealing with the level of authorized AFDC payments and its duty under G. L. c. 118, § 2. The plaintiffs contend that, because the AFDC standard of payment fixed by the Legislature is substantially below the level of payment necessary to meet the standard of G. L. c. 118, § 2, determined by the department, the defendants have an obligation to seek additional funds from the Legislature so that the department may provide aid sufficient to permit AFDC parents properly to bring up their children in their homes. The plaintiffs

*Schramm*, 772 F.2d 1114, 1119 [3d Cir. 1985]), but it does not impose any separate Federal requirement in determining an AFDC standard of need, except to assure that the standard of need is not to be less than the standard of payment (see 45 C.F.R. §§ 233.20 [a] [2] [i], [b] [2] [1986]) and to assure, as appears to be the case here, that the standard of need remains above the level required by 42 U.S.C. § 602 (a) (23) (1982) (see *Everett* v. *Schramm, supra* at 1115, 1120; *Bourgeois* v. *Stevens*, 532 F.2d 799, 803 [1st Cir. 1976]).

400 Mass. 806                                                          819

Massachusetts Coalition for the Homeless *v.* Secretary of Human Services.

agree that the Legislature has lawfully fixed the AFDC stand-ards of payment in the annual budgetary process. It could be argued, therefore, that the Legislature has determined the AFDC payment level necessary to satisfy the requirements of State law. On the other hand, the Legislature has not repealed the department's obligation under G. L. c. 118, § 2, to "aid a parent in properly bringing up, in his or her own home, each dependent child," and to furnish financial aid which shall be sufficient to do so at a level that is "in accordance with budget-ary standards of the department."

The defendants suggest that there is no continuing dilemma because the department's obligation under the first paragraph of G. L. c. 118, § 2, to provide aid in an amount determined in accordance with the department's budgetary standards was eliminated by the enactment in 1974 of the fourth paragraph of § 2.[12] The claim is that obligations under the first paragraph depend entirely on the availability of funds. The fourth para-graph by its reference to appropriations seems more likely directed at payment levels than at budgetary standards. In any event, we see no basis for concluding that the fourth paragraph alters the aid which is required under the first paragraph of § 2.

If in any year the department concludes that the funds appro-priated for AFDC purposes are insufficient to permit it to furnish that level of financial aid which § 2 directs it to provide, the department has an obligation to bring its inability to comply with the payment level described in § 2 to the attention of the Legislature and to ask that it appropriate an adequate sum or that it provide some other solution to the dilemma.[13] See *County*

---

[12] The fourth paragraph, added by St. 1974, c. 623, § 3, reads as follows:
"Effective July first of every year, subject to appropriation, the department shall increase the total budget of each eligible recipient, before taking into consideration any available income and resources, by a percentage amount equal to the percentage rise in the United States Consumer Price Index for January first of that year over the level of said index for January first of the previous year plus such additional percentage amount as is recommended annually by the department and appropriated by the general court."

[13] In determining whether it has sufficient funds to give financial assistance at the level required by § 2, the department may consider the assistance provided to parents with dependent children not only through AFDC but also through other financial assistance programs as well, such as food stamps, energy assistance, and public or subsidized housing.

*Comm'rs of Plymouth* v. *State Superintendent of Bldgs.*, 383 Mass. 262, 267-268 (1981). If the Legislature on request has declined to appropriate funds necessary to permit the commissioner and the department to fulfil their statutory duties, the defendants would be discharged, for the time being and to that extent, of their obligation to comply with the level of financial aid prescribed by § 2. See *Blaney* v. *Commissioner of Correction*, 374 Mass. 337, 342 (1978).

It appears that, when it set the AFDC appropriation and the standard of payment for fiscal year 1988, the current Legislature was aware, from the department's § 2 (B) (*g*) report of last August (and from other sources), of the inadequacies of the level of AFDC payments tested against the statutory standard of G. L. c. 118, § 2. The defendants need do no more than request a solution to the dilemma. This obligation is an annual one as long as the level of aid described in § 2 exceeds the sum of the AFDC standard of payment fixed by the Legislature and any assistance provided by other programs. Barring constitutional requirements (not involved here) or requirements of Federal law,[14] the Legislature controls the extent to which it will perpetuate the inconsistency between G. L. c. 118, § 2, and the AFDC standard of payment.

A declaration of the department's obligations should be made in accord with this discussion.

4. We discuss finally the judge's orders that no AFDC family remain more than ninety days in hotels, motels, or emergency shelters. The judge ordered the commissioner to find nontransient housing for named individual plaintiffs who had been in transient housing for more than ninety days, directing him, if necessary, "to expend AFDC funds to enable them to secure such housing in the private rental market." The Superior Court judge further enjoined the department "from placing AFDC families in hotels, motels and emergency shelters for more than a total of ninety days." A single justice of this court stayed the effect of these orders.

---

[14] The plaintiffs rely on the Federal law requirement that the State conform to its own law in determining AFDC standards. Their other assertions based on Federal law seem to rest on no separate requirement of Federal law.

There is no question that homeless families entitled to AFDC present an especially acute problem.[15] We reject the defendants' argument that the obligation of G. L. c. 118, § 2, to provide aid sufficient to enable an AFDC parent to bring up a child "properly in his or her own home" really only means that the family should be kept together. The statutory reference to one's own home means accommodations and circumstances which are normally associated with a place of permanent residence. That has been the consistent view of what was intended in § 2. The words "properly in their own homes" appeared in the seminal legislation in this Commonwealth establishing a special kind of aid for certain mothers with dependent children. St. 1913, c. 763, § 1. See 1913 House Doc. No. 2075, p. 41, Report of the Commission on the Support of Dependent Minor Children of Widowed Mothers. See *Cohasset* v. *Scituate*, 309 Mass. 402, 409 (1941) (G. L. c. 118, § 2, concerns not only food, shelter, and necessities for a needy family, but also expresses a manifest purpose "to have needy children brought up in homes of their own by relatives"). Today's emergency shelters may have more than a casual resemblance to almshouses whose use for needy families with children our remedial legislation was designed to end.[16]

---

[15] Affidavits of AFDC recipients and shelter workers contained in the record paint a vivid picture of the devastating effects of homelessness on AFDC families, as the trial judge noted. Homelessness and the threat of homelessness produce highly stressful situations which take a heavy emotional toll on family members. Homeless families often are dislocated from their original towns, jobs, and schools and are forced to move from one temporary, crowded living arrangement to another. Parents experience feelings of degradation and depression and fear for the well-being of their children. Children are particularly vulnerable to the loss of security and to the disruption homelessness produces. They face repeated interruptions, changes of schooling, loss of friends, malnutrition, and infection. They often exhibit behavior problems which were not evident when the family had a home.

[16] Emergency shelters and motels in which homeless families on AFDC are placed may minimally satisfy the need for shelter, but they are institutional settings which do not allow for a normal family life. In shelters conditions are often crowded, resulting in a lack of privacy and tensions among residents. Familiar patterns of eating, sleeping, working, and maintaining personal cleanliness are disrupted. House rules and curfews restrict

Although we agree with the judge that § 2 places a duty on the department to prevent, as far as reasonably possible, the use of transient housing by AFDC families, the subject of what orders should be entered concerning the use of such housing accommodations needs further attention. Individual plaintiffs and interveners probably no longer need a court order concerning their particular transient situations.[17] The general order not to permit use of hotels, motels, and emergency shelters for a family for more than ninety days would perhaps be appropriate in a class action. This is, however, not yet a class action. Although the complaint is expressed as a class action, and although the judge invited the plaintiffs to request a hearing on class certification (Mass. R. Civ. P. 23, 365 Mass. 767 [1974]), there was no certification of any class before the judge's orders were entered.

A hearing should be held on the matter of class certification and, if a class or classes are certified, a hearing should be held on the nature of any order that might be entered. Perhaps the order should make a distinction between families which do and do not object to the department's use of transient housing for them. Any general requirement that temporary shelter not be used beyond a stated time may be inappropriate to particular

---

personal freedom, and some shelters do not allow residents to stay during the day. Multiple authority figures in shelters can confuse children and erode the mother's role and control of her family. Motels in which AFDC recipients are placed are often dirty, noisy, and provide no place for children to play. They lack cooking and refrigeration facilities so that families must subsist without cooked meals. Some lack adequate security and expose children to harsh aspects of adult life, such as violence and prostitution.

The department estimates that at any one time approximately 200 families will have been receiving emergency shelter for more than ninety days. While the provision of temporary emergency housing for homeless families is a necessary component of any plan to combat homelessness, housing families for extended periods in the conditions of shelters and motels is not an adequate substitute for the permanent, stable home environment contemplated by G. L. c. 118, § 2.

[17] It appears that as of March 31, 1987, none of the named plaintiffs and none of the AFDC recipients whose affidavits were submitted in support of the motion for a preliminary injunction remained in hotels, motels, or emergency shelters. Of the five interveners who submitted affidavits in early 1987, only one remained in transient housing on March 31, 1987.

400 Mass. 806                                                        823

Massachusetts Coalition for the Homeless *v.* Secretary of Human Services.

cases. An order that the department take all reasonable steps to remove each AFDC family from temporary shelter within a stated number of days may be all that can be expected, leaving individual cases for judicial consideration.

Any direction to expend funds to obtain accommodations in the private market should be preceded by a careful analysis of what appropriated funds are available and of what other purposes for which those funds were appropriated will or may be frustrated.[18] Additionally, the judge should consider whether any direction to go into the private market using public funds may provide a means by which individual families will obtain an inequitable (perhaps even unlawful) advantage over those AFDC families living within the AFDC standard of payment. The fact that the daily cost of hotels, motels, and other transient accommodations for particular AFDC families exceeds what the department would have to pay to obtain rental accommodations in the private market may not be the dispositive consideration. The Legislature is the arbiter of the allocation of public funds, and its judgment concerning the most appropriate way in which to solve the problems of homeless AFDC families must be respected.

On the other hand, as long as G. L. c. 118, § 2, directs the department to provide aid sufficient to enable AFDC recipients to have homes, and not just necessities, the department must reasonably seek to fulfil its obligation with such funds as are available for the purpose. If funds appropriated for the purpose are insufficient or if there are no such appropriated funds, the department should advise the Legislature and either seek an appropriation to cover the apparent deficiency or request the Legislature to take some other action that will eliminate the problem.

The judicial role in assuring compliance with a statutory mandate involving the expenditure of public funds is a delicate one. The judgment of the executive agency as to how to carry out its obligations must be given deference. Once a failure to

---

[18] The interests of other, differently situated AFDC beneficiaries may have to be represented.

comply with a statutory mandate is found, however, an order directing the department to submit to the court its program for fulfilling its statutory obligations may be an appropriate initial step. See *Blaney* v. *Commissioner of Correction*, 374 Mass. 337, 339 (1978). Subsequent orders may be necessary. *Id.* at 341. The process often calls for a careful mixture of judicial persistence, patience, and firmness.

5. We vacate the judge's rulings and orders concerning the defendant commissioner and secretary and the department, contained in his order of June 26, 1986, and we vacate his orders of January 5, 1987. A declaration shall be entered in this case in the Superior Court on the following points:

(a) The Legislature in the annual State budget has established the standard of need for AFDC purposes under the law of the Commonwealth for recent fiscal years, including the 1987 and 1988 fiscal years.

(b) The AFDC standard of need in this Commonwealth is not established by the Department of Public Welfare in carrying out its annual obligations under G. L. c. 18, § 2 (B) (*g*), so long as the Legislature determines the standard of need for AFDC purposes in the annual State budget or otherwise.

(c) As a matter of State law, the Department of Public Welfare had and has no role in determining the AFDC standard of need in recent fiscal years, including 1987 and 1988.

(d) The Department of Public Welfare has the duty pursuant to G. L. c. 18, § 2 (B) (*g*), to review annually the adequacy of its standard budget or budgets of assistance to determine whether those budgets comply with the requirement of G. L. c. 118, § 2, that the amounts shown are sufficient to enable an AFDC parent to bring up his or her child or children properly in his or her own home.

(e) Following its annual review pursuant to G. L. c. 18, § 2 (B) (*g*), the Department of Public Welfare must issue a written report which shall either provide or permit a comparison in dollars between standard budgets of assistance of each successive year and which shall discuss the adequacy of AFDC grant levels in comparison with the standard budget or budgets of assistance and with changes in the consumer price index.

(f) Whenever the Department of Public Welfare determines that the funds appropriated for AFDC purposes are insufficient to permit it to furnish that level of financial aid which G. L. c. 118, § 2, directs the department to provide, the department must bring its inability to comply with the level of aid described in § 2 to the attention of the Legislature and must ask for an adequate appropriation or for some other solution to the problem.

(g) The Department of Public Welfare has an obligation under G. L. c. 118, § 2, to provide aid sufficient to permit AFDC parents to live in a home, and not simply to provide accommodations to AFDC parents. The furnishing of accommodations in hotels, motels, and emergency shelters does not fulfil the department's duty under § 2.

Before a final judgment is entered in this case, certain interlocutory orders may be appropriate. Injunctive relief as well as declaratory relief may be appropriate in the final judgment, although it has been our practice to assume that public officials will comply with the law declared by a court and that consequently injunctive orders are generally unnecessary.

There are other issues that are or may be raised in the complaint and answer which may require further proceedings. In any event, the question of the Department of Public Welfare's obligations concerning homeless AFDC families, discussed in this opinion, requires further attention, assuming the plaintiffs wish to pursue the issue.

We transfer the case back to the Superior Court where further proceedings shall be held in accordance with this opinion.

*So ordered.*